AUDREY ZARRELLI ET AL., CO-ADMINISTRATORS
(ESTATE OF JANICE GOODWIN) *v.* THE BARNUM
FESTIVAL SOCIETY, INC., ET AL.
(3239)

HULL, SPALLONE and DALY, Js.

Argued January 15—decision released February 25, 1986

*David S. Golub,* with whom, on the brief, were *Jay H. Sandak* and *Stanley A. Twardy, Jr.,* for the appellants (plaintiffs).

*Patrick J. Flaherty,* with whom were *Louis B. Blumenfeld* and, on the brief, *Michael T. McInerny,* for the appellee (named defendant).

*Bruce M. Killion,* for the appellee (defendant Connecticut National Bank).

HULL, J. This case raises, in stark relief, the question of the adequacy of a jury award of $65,000, before reduction for comparative negligence, for the negligently caused death of a twenty-two year old single, working female who was run over by the rear wheels of a flatbed trailer and died twenty-five days later from the injuries received. We conclude that we must "bite the bullet" and, for the first time in Connecticut, find in the necessarily uncertain area of a jury's valuation of a human life, such an award inadequate as a matter of law.

On July 5, 1976, the plaintiffs' decedent Janice Goodwin, was a passenger on a float in a Barnum Festival parade in Bridgeport when she fell through a false cardboard floor and was crushed by the rear wheels of the flatbed trailer carrying the float. The plaintiffs, coadministrators of the decedent's estate, brought this negligence action against the Barnum Festival Society, Inc., Connecticut National Bank (CNB) and United Technologies Corporation (UTC). The plaintiffs claimed that CNB sponsored the float and that UTC lent the tow motor and flatbed trailer which were used to transport the float. The jury returned a verdict in favor of the defendants CNB and UTC and in favor of the plaintiffs against Barnum in the amount of $65,000, reduced to $35,750 because the jury found the plaintiffs' decedent to be 45 percent comparatively negligent. The plaintiffs filed a motion to set aside the verdict, for judgment notwithstanding the verdict and for a new trial. The trial court denied that motion. The plaintiffs appeal from the judgment on the verdict, claiming inadequacy of the damages assessed against Barnum and claiming error in the finding that the defendant CNB was not liable. The plaintiff claims that the evidence estab-

lished that CNB was jointly liable for Barnum's negligence because CNB as a sponsor-agent of Barnum had broad authority over the construction and operation of the float. We find that the court erred in not setting aside the verdict against Barnum on the grounds of inadequacy and did not err in refusing to set aside the verdict for CNB.[1]

The facts, viewed in the light most favorable to sustaining the verdicts; *Herb* v. *Kerr,* 190 Conn. 136, 459 A.2d 521 (1983); are as follows: The Barnum Festival Society is an organization of volunteers which holds an annual festival of events in Bridgeport including a parade with floats sponsored by different private companies. CNB donated money to Barnum for the parade. At the time CNB's funds were committed to the festival, it did not know that those funds would be used to construct a float. CNB took no part in the supervision of the float's construction.

The float resembled a trolley car. It was built on a flatbed trailer pulled by a tow motor, both of which were supplied by UTC. The trailer was hooked to the tow motor by a gooseneck coupler. Since the gooseneck stuck up in the air, the builders of the float covered it and made it into an enclosure for the conductor. They built a false floor around the gooseneck using cardboard supported by furring strips. This cardboard floor was then covered in the same manner as the rest of the floor of the float.

Janice Goodwin was on the "Wing Ding" committee which consisted of a group of volunteers who organized a special event for children and built a float for the parade. Goodwin helped build the float involved in this case and was aware that the false floor would not support her. She had been asked immediately before the start of the parade to warn others of the false floor.

---

[1] The plaintiffs did not appeal the verdict in favor of the defendant UTC.

She had been drinking during the parade and shortly before the accident declared she was drunk. On the way back to the starting point of the parade, she moved up to the platform seat at the conductor station which was surrounded by the false floor. She fell off the platform seat and through the false floor beneath the moving trailer. She was run over by the rear wheels.

While on the ground, Goodwin was aware that she was about to be run over by the trailer. The wheels ran over her midsection crushing her pelvic area and leaving a visible tire track. She received very severe and painful injuries to the organs, bones and tissue of the pelvic area. Immediately after the accident, Goodwin was writhing in pain and pleading "don't let me die." She was taken to Bridgeport Hospital where she was in constant pain throughout her twenty-five day hospitalization until her death. She was aware of the massive nature of her injuries and in constant fear of dying. She was very upset that her pelvic injuries would prohibit her from bearing children. Despite massive medical procedures, Goodwin died on July 30, 1976, as a result of her injuries.

When she died, Goodwin was twenty-two years old. She was an active and healthy young woman who was well liked by her friends. She lived with her fiance, Joseph Lopez, and they planned to be married on July 9, 1976. She had a very close and special relationship with her mother. She particularly enjoyed music and dancing. She had a fondness for, and rapport with, children. She was employed at the time of her death as a bank teller at an annual salary of $6725, and was to receive a raise to $7300 a year in September, 1976. She received fringe benefits worth $700 a year. She was an excellent employee who was popular with her co-workers. She had an earning expectancy of $168,000 after reduction to present value and deduction of personal living expenses and taxes. The economic value

of the services she could have rendered as a housewife and mother was $612,000, after reduction to present value. She had an estimated life expectancy of 57.22 years, and an estimated work life expectancy of 25.12 years. Medical expenses totalled $9107.62. Funeral expenses were $1441.25.

There are serious constitutional issues posed by setting aside a jury verdict. This is so because " '[l]itigants have a constitutional right to have issues of fact decided by the jury.' *Bambus* v. *Bridgeport Gas Co.,* 148 Conn. 167, 169, 169 A.2d 265 (1961). 'The right to a jury trial is fundamental in our judicial system, and . . . the right is one obviously immovable limitation on the legal discretion of the court to set aside a verdict, since the constitutional right of a trial by jury includes the right to have issues of fact as to which there is room for reasonable difference of opinion among fair-minded men passed upon by the jury and not by the court.' *Camp* v. *Booth,* 160 Conn. 10, 13, 273 A.2d 714 (1970); *Jacobs* v. *Goodspeed,* 180 Conn. 415, 429 A.2d 915 (1980); *Gosselin* v. *Perry,* 166 Conn. 152, 168, 348 A.2d 623 (1974)." *Barbieri* v. *Taylor,* 37 Conn. Sup. 1, 2, 426 A.2d 314 (1980). Accordingly, a court should move cautiously in deciding to set aside a jury's verdict.

A court should be especially hesitant to set aside a jury's award of damages. This is particularly true in a wrongful death case where "[i]t serves no useful purpose to compare a verdict in one . . . case with those in others. No one life is like any other, and the damages for the destruction of one furnish no fixed standard for others." *Fairbanks* v. *State,* 143 Conn. 653, 661, 124 A.2d 893 (1956). The assessment of damages "defies any precise mathematical computation"; *Floyd* v. *Fruit Industries, Inc.,* 144 Conn. 659, 675, 136 A.2d 918 (1957); and, therefore, establishing damages for wrongful death is a task peculiarly within the expertise of a jury. *Kiniry* v. *Danbury Hospital,* 183 Conn.

448, 461, 439 A.2d 408 (1981); *McKirdy* v. *Cascio,* 142 Conn. 80, 85, 111 A.2d 555 (1955). "However, it is the court's duty to set aside the verdict when it finds that 'it does manifest injustice, and is . . . palpably against the evidence. . . . ' *State* v. *Chin Lung,* 106 Conn. 701, 704, 139 A. 91 (1927)." *Barbieri* v. *Taylor,* supra, 3.

"The trial court's refusal to set aside [a] jury verdict is entitled to great weight and every reasonable presumption should be given in favor of its correctness." *Kalleher* v. *Orr,* 183 Conn. 125, 127, 438 A.2d 843 (1981); *Waldron* v. *Raccio,* 166 Conn. 608, 618, 353 A.2d 770 (1974). This is so because "[f]rom the vantage point of the trial bench, a presiding judge can sense the atmosphere of a trial and can apprehend far better than [an appellate court] can, on the printed record, what factors, if any, could have improperly influenced the jury." *Birgel* v. *Heintz,* 163 Conn. 23, 26, 301 A.2d 249 (1972). Our function on appeal is, accordingly, limited to determining whether the trial court abused its discretion in denying the plaintiffs' motion to set aside the verdict. Such a decision "can be disturbed only by considerations of the most persuasive character, as where the verdict shocks the sense of justice or the mind is convinced that it is in fact entirely disproportionate to the injury. [Maltbie,] Conn. App. Proc., p. 151." *Mulcahy* v. *Larson,* 130 Conn. 112, 114, 32 A.2d 161 (1943). The standard of review for an appellate court in a case like this was first stated in *Briggs* v. *Becker,* 101 Conn. 62, 66–67, 124 A. 826 (1924): "[T]he only practical test is whether the total damages awarded fall somewhere within the necessarily uncertain limits of fair and reasonable compensation in the particular case, or whether the verdict so shocks the sense of justice as to compel the conclusion that the jury were influenced by partiality, prejudice, mistake or corruption." It is important to note that *Briggs* and the cases that have followed do not require

a direct showing of partiality, prejudice, mistake or corruption, but rather stand for the proposition that if the amount awarded "shocks the sense of justice" as to what is reasonable, then the inferred conclusion is that the jury were misguided in reaching its decision.[2] See generally *Raia* v. *Topehius,* 165 Conn. 231, 239, 332 A.2d 93 (1973); *Hook* v. *Dubuque,* 153 Conn. 113, 115, 214 A.2d 376 (1965).

In death cases, the plaintiff is entitled to damages which consist of reasonably necessary medical, hospital and funeral expenses together with "just damages," including: "(1) the value of the decedent's lost earning capacity less deductions for her necessary living expenses and taking into consideration that a present cash payment will be made, (2) compensation for the destruction of her capacity to carry on and enjoy life's activities in a way she would have done had she lived, and (3) compensation for conscious pain and suffering." *Katsetos* v. *Nolan,* 170 Conn. 637, 657, 368 A.2d 172 (1976).

Ante mortem and funeral expenses of $10,548.87 were stipulated to by the parties. We are thus faced with an award of roughly $54,500 for the elements of damages outlined above. We do not deem it necessary to discuss each of Barnum's arguments concerning the details of the elements of damages.[3] For the verdict so clearly shocks the conscience and is so entirely disproportionate to the injury, that even giving weight to all of Barnum's claims, the court was in error in not setting aside the verdict on the grounds of inadequacy. There are, as Barnum claims, elements in the case

---

[2] In this case, no claim is made that there was any misconduct on the jury's part. The award of $65,000, in and of itself, is the basis of the appeal.

[3] CNB, to protect its rights should this court find error in the judge's refusal to set aside the jury's verdict as to it, joined in Barnum's argument regarding damages. Since we find no error in the court's refusal to set aside the verdict for CNB, we do not address separately CNB's claims as to the adequacy of the verdict.

which might have led the jury to be less than generous in its award. The plaintiff's drinking is one example; the fact that the defendant Barnum is a nonprofit enterprise, largely staffed by volunteers, is another.[4] The doctrine of comparative negligence, however, provided the jury a vehicle for weighing the comparative fault of the parties. Once having done this, by finding the plaintiffs' decedent 45 percent negligent, it was then the jury's duty to award just damages in the light of all of the circumstances. This the jury did not do.

The plaintiffs' second claim is that the court erred in not granting its motion to set aside the verdict, for judgment notwithstanding the verdict and for a new trial because the jury failed to find the defendant CNB liable as a sponsor of the festival. The ultimate test is whether given the evidence offered at trial, viewed in the light most favorable to sustaining the verdict; *Herb* v. *Kerr,* 190 Conn. 136, 140, 459 A.2d 521 (1983); the jury reasonably could have concluded as it did. An examination of the evidence in this light shows ample support for the jury's verdict. The evidence showed that CNB's role as a sponsor basically was limited to financial assistance. It did not have that degree of control and management over the construction of the float that would impose liability on CNB under any theory. We will not disturb the jury's verdict.

There is error in part, the judgment is set aside as to the amount of damages found by the jury but not as to the degree of comparative negligence, and the case is remanded for a new trial limited to the issue of damages.

In this opinion the other judges concurred.

---

[4] We cannot speculate, as Barnum would have us do, on the possibility of a compromise verdict on liability affecting the damages portion of the verdict.